2022 IL App (2d) 220082-U
No. 2-22-0082
Order filed December 27, 2022

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kane County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 18-CM-2096 |
| REGULO R. RIVERA, | ) ) ) | Honorable Keith A. Johnson, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE McLAREN delivered the judgment of the court.
Justices Hutchinson and Jorgensen concurred in the judgment.

**ORDER**

¶ 1  *Held*:  The State proved beyond a reasonable doubt that defendant committed domestic battery by punching his sister-in-law in the head. Defendant and the victim presented starkly conflicting accounts of the incident, and we defer to the court's finding that the victim was more credible.

¶ 2  After a bench trial, defendant, Regulo R. Rivera, was found guilty of domestic battery based on bodily harm (count I) (720 ILCS 5/12-3.2(a)(1) (West 2018)) and domestic battery based on physical contact (count II) (*id*. § 12-3.2(a)(2)). The trial court merged count II into count I and entered a conviction on count I. The court then sentenced defendant to one year of conditional

discharge. On appeal, defendant contends that he was not proved guilty beyond a reasonable doubt. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4      The State charged defendant by criminal complaint. Count I of the complaint alleged that he committed domestic battery in that he knowingly caused bodily harm to Dafne Gomez-Saldana (Dafne), his sister-in-law, by throwing water at her, then punching her in the head with a closed fist. Count II alleged that he knowingly made physical contact of an insulting nature by punching her in the head with a closed fist. We summarize the trial evidence.

¶ 5      Mark Ramos, a Carpentersville police officer, testified on direct examination that, on August 9, 2018, he was dispatched to defendant's home. Defendant was there. Ramos spoke briefly to Dafne, the sister of defendant's wife, Jhoany Gomez-Saldana (Jhoany). Dafne appeared upset; her eyes were red and puffy from crying, and her shirt was wet. Dafne was pointing to her left temple. Ramos did not know enough Spanish to understand most of what Dafne told him, but he testified that she said something about having been hit.

¶ 6      Ramos testified on cross-examination that, when he arrived at the house, defendant met him at the door and allowed him to enter. Defendant did not appear to be upset. Later, defendant allowed Ramos to enter the basement. Ramos did not attempt to speak to Dafne until they went outside, and then he realized he would need to call another officer to talk with her. Dafne pointed to her temple. "[B]ecause [of] her hair and the lighting," Ramos did not see any injury. Ramos did not take photographs, and Dafne did not request medical attention.

¶ 7      Ramos testified on redirect that defendant told him that he had gotten into an argument but that everything was fine. Ramos saw no injuries to defendant.

¶ 8    Dafne testified on direct examination that, on August 9, 2018, she and her children resided at the home of defendant and Jhoany with their children.  About midnight, Dafne came home from work and went to the basement, where she lived.  Defendant was in the living room and Jhoany was in her bedroom.  After going to the basement, Dafne went upstairs to take her son to the basement.  Defendant saw her and called her bad words, including "bitch."  Dafne went back downstairs with her son.  Defendant was angry and told her to shut off the light in the basement because she was not paying for the electricity.

¶ 9    Dafne testified that she told defendant to stop swearing at her and insulting her.  He descended the stairs most of the way and stood near her.  He then threw a drink in her face; it fell on her son, and he started to cry.  Dafne saw defendant approach angrily, and she threw a plastic toy at him.  Dafne tried to reach over to her son, but defendant was now standing at ground level.  With a closed fist, he punched her in the left temple.  The blow caused her pain that was "stronger than when you have a headache.  Defendant then went back upstairs.  Dafne called the police on her cell phone.  One officer arrived but did not speak Spanish; later, a Spanish-speaking officer arrived, and Dafne spoke with him.  She also completed a written statement.

¶ 10    Dafne testified on cross-examination that, when she spoke to the police, she did not request any medical help.  Neither she nor the officers took photographs; her cell phone did not have a camera.  Dafne's argument with defendant had been over his threat to kick her out of the house because she was living there rent-free and not contributing to living expenses.  He threw a soda, not a water bottle, at her.  After the incident, she moved out and has not lived there since.

¶ 11    Dafne testified that, sometime after the incident, she contacted the State's Attorney's office to apply for a U visa, which would enable her to stay in the country legally. However, on redirect, Dafne testified that, on August 9, 2018, she did not know she could apply for a U visa.

¶ 12    The State rested.

¶ 13    Ramos testified for the defense that his police report did not state that Dafne reported suffering any pain.  However, she spoke exclusively in Spanish, and Ramos understood little of what she said and did not ask about her injuries.  Instead, he called for a Spanish-speaking officer.

¶ 14    Edwin Alba, the Spanish-speaking officer, testified that he spoke with Dafne.  He could not recall whether she mentioned that she had suffered any pain.  However, he saw that "she was shaken up, she seemed scared and she was wet."

¶ 15    Defendant testified on direct examination as follows.  Dafne was his sister-in-law, and he had known her for 18 years.  In early August 2018, she and her two children resided in defendant's home with him, Jhoany, and their five children.  Dafne and her children lived in the basement and defendant and his family lived on the one floor upstairs.

¶ 16    Defendant testified that, as of August 8, 2018, Dafne had worked for two weeks between 3 and 10 p.m. but had not previously worked while living in his home.  She had contributed nothing financially to the household.  On August 8, 2018, Dafne returned around midnight.  Everyone else was home.  Dafne's children were in the basement, as always when she was out. Dafne had no key, so she rang the bell, and defendant let her in.  They started arguing; defendant asked her why she was back so late and criticized her for making her children stay in the basement.  She said nothing and just walked away and went downstairs.  Defendant stood by the door to the basement and kept talking to Dafne, but she did not respond.

¶ 17    Defendant testified that he then went downstairs and stood near Dafne, who was standing near the foot of the stairs.  He told her that there were rules for living in his house and that he would not let her stay there if she did not obey them.  Dafne became very angry.  Defendant told her that she had to leave the house, although her children could stay.  Dafne picked up a broomstick

and struck defendant once on the right side of his head. To make her go away, defendant squeezed a water bottle he was holding, squirting water onto her. He then turned and walked upstairs. While he was ascending the stairs, Dafne tossed a small toy shopping cart at him, hitting him in the back. As defendant entered the living room, he heard Dafne calling the police on her cell phone. During the encounter, he never punched Dafne or touched her with any part of his body.

¶ 18 Defendant testified that, as of August 2018, he had lived with Dafne for about year, first in Texas and then in Carpentersville. During that time, whenever he had to talk to her, she became temperamental and rude. In addition, Dafne had a short temper and got angry quickly at defendant and her sister, although she was "a good person."

¶ 19 Defendant testified on cross-examination that he told Ramos that he was tired of Dafne. He also told Ramos that Dafne had hit him with a broomstick. Although Ramos did not find any broomstick in the basement, "[h]e didn't look for it" and "it [was] a big basement." When the toy cart hit defendant, it hurt. However, he had no marks from either the broomstick or the cart.

¶ 20 Defendant testified that he told Ramos that he would call Immigrations and Customs Enforcement (ICE) on Dafne. While speaking with the officers, defendant did not recall that he had two cell phones in his possession. Although the officers talked to Dafne's son Randy, defendant was not there for the conversation. Defendant then testified that he did not tell Ramos that he was not afraid of Dafne. Asked whether he told Ramos that he would call ICE and have her deported, defendant testified, "No. I didn't say that." He did not remember grabbing one of his cell phones, calling someone, and telling that person that he was "going to get arrested because of that bitch."

¶ 21    Jhoany testified as follows. She had lived with Dafne, her younger sister, since they were both little and saw her almost daily. Dafne was "aggressive towards people" and "her temperament or mood [was] very strong." Jhoany did not want to see defendant get into trouble with the law.

¶ 22    Defendant rested. The trial court took judicial notice that, according to the State's disclosure in discovery, Dafne filed a request for a U visa form. The document itself is not in the record on appeal, but it is apparent that the court read the document.

¶ 23    In rebuttal, Ramos testified that he spoke first with defendant. Defendant allowed Ramos into the home and was very cooperative. He told Ramos that he and Dafne argued, that she hit him in the head with a broomstick, and that he "threw water" at her. Ramos went to the basement and looked for a broomstick, but he found none. He saw no marks on defendant.

¶ 24    Ramos testified that he was present when Alba spoke with Randy outside the house. During the conversation, defendant was looking at Randy and telling him to tell the truth. Defendant had two cell phones. He made a call on one and said " [']that bitch is going to get [him] arrested,['] something to that [effect]." From defendant's demeanor, it appeared that "he was trying to be intimidating."

¶ 25    After hearing arguments, the trial court stated that the evidence of Dafne's character came from witnesses who were biased toward defendant, and it deserved little weight. Essentially, Ramos and Dafne presented one version of the incident and defendant presented another.

¶ 26    The court continued:

        "In determining what is the credible version of events here, I asked myself why
        would [Dafne] call the police to the home and lie. This was the last resort for her to call
        the police. She was calling the police on her sister's husband. She was calling the police
        on the person who was providing shelter for her and her two children. Calling the police

risked getting her and her children kicked out of the house. In fact after this incident, [Dafne] left the home and did not reside there again.

If her legal status in this country was questionable, and it sounds like it may have been based on the evidence presented, why would she call 911, have the police come to the house, and draw attention to herself? *** [I]t's been argued that she concocted a fake story of a domestic battery so she can pursue a U-Visa application.

The Court does not believe that [Dafne] plotted and schemed in that manner to get a U-Visa. This incident happened on August 9 of 2018. [Dafne] did not send a U-Visa request to the State's Attorney's office until some point in 2019 according to the People's discovery disclosure ***.

This was not a situation where within days, weeks or even a few months after the incident [Dafne] sent a request to the State's Attorney's Office for a U-Visa.

Observing [Dafne]'s demeanor while testifying, she appeared to be fearful; fearful not because she was lying or embellishing but because she is testifying against her sister's husband which will very likely adversely affect her relationship with her sister and *** the extended family."

The court noted further that under either version of the encounter, defendant initiated the argument with Dafne and continued it by going downstairs and escalating the situation into a physical confrontation. Further, although Ramos testified that defendant was cooperative, he also testified that defendant tried to be intimidating. Thus, the court found that "[D]afne's version of events [was] the credible version of events."

¶ 27 The court found that the State proved (1) bodily harm, as Dafne had testified that defendant's punch caused her pain worse than a headache, and (2) insulting or provoking contact,

as the punch met that element also. The court merged count II into count I, entered a conviction on the latter, and sentenced defendant to a year's conditional discharge. He timely appealed.

¶ 28                                   II. ANALYSIS

¶ 29    On appeal, defendant contends only that the evidence did not prove him guilty beyond a reasonable doubt of domestic battery under either charge. Defendant argues that Dafne's testimony was "largely uncorroborated" and that she had a motive to falsify. We decline defendant's invitation to supplant the trial court by retrying him, and we hold that, under established principles of review, the evidence was plainly sufficient.

¶ 30    In deciding whether the evidence was sufficient to prove guilt beyond a reasonable doubt, we do not consider whether we believe the trial evidence established guilt beyond a reasonable doubt. *People v. Holmes*, 141 Ill. 2d 204, 239 (1990); see *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979). Rather, we ask whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *People v. Baskerville*, 2012 IL 111056, ¶ 31; *People v. Ward*, 154 Ill. 2d 272, 314 (1992). The fact finder, not this court, is responsible for determining the witnesses' credibility, weighing their testimony, and deciding on the reasonable inferences to be drawn from their testimony. *People v. Hill*, 272 Ill. App. 3d 597, 603-04 (1995). Given our deferential standard of review, we conclude that defendant was proved guilty beyond a reasonable doubt on both counts.

¶ 31    A person commits domestic battery if he knowingly and without legal justification either (1) causes bodily harm to any family or household member or (2) makes physical contact of an insulting or provoking nature with any family or household member. 720 ILCS 5/12-3.2(a)(1), (a)(2) (West 2018). Here, the trial court found that Dafne, defendant's sister-in-law who was living in his house at the time, suffered bodily harm *and* insulting/provoking contact when defendant

punched her in the head. The court based its finding on a straightforward premise: Dafne was more credible than defendant.

¶ 32    Defendant does not contend that there was a reasonable doubt whether Dafne was a member of his family or household. Further, defendant does not dispute that, if credited, Dafne's testimony proved the remaining elements of both charges. Thus, defendant's claim of error is essentially that Dafne's testimony was inherently unworthy of belief. Because witness credibility is primarily for the fact finder, defendant's burden is extremely high.

¶ 33    Defendant contends that Dafne was inherently incredible because her version of the incident was "largely uncorroborated" and she had a motive to falsify. Neither of these purported reasons prevented the trial court from crediting Dafne over defendant. They simply raised issues within the trial court's prerogative to resolve, and the court explained cogently and in considerable depth why it resolved these issues in the State's favor.

¶ 34    First, the purported lack of corroboration was not crucial. As defendant recognizes, the fact finder may find guilt beyond a reasonable doubt based on the positive testimony of a single credible witness. *People v. Smith*, 185 Ill. 2d 532, 541 (1999). Dafne's testimony was consistent and straightforward in every important respect. She unequivocally testified that defendant punched her, with specified results. The trial court observed her testify and found her credible.

¶ 35    Defendant points out that (1) neither Dafne nor the officers photographed her injury, (2) Alba did not testify that Dafne complained of any pain, and (3) the State did not call her son to testify to his observations of the incident. Defendant has established only that the evidence against him could theoretically have been stronger. That is not the standard for reversal. Neither photographs nor the observations of a small child were needed to prove that the punch caused Dafne pain, much less that it was an insulting or provoking act.

¶ 36    Defendant also argues that Dafne's crying and upset demeanor could have resulted from the argument even had defendant not punched her.  But this demeanor evidence was not needed to prove any element of either charge.  Also, the trial court, in the exercise of its prerogative, could reasonably infer from Dafne's demeanor after the incident that she had not fabricated the account and that she was still emotionally shaken by defendant's physical violence.

¶ 37    Next, defendant speculates that Dafne's pointing to her left temple could have signified that defendant threw his drink there and not that he punched her there.  Again, defendant asks us to supplant the trial court as factfinder.  Moreover, there was no evidence that defendant threw the drink at Dafne's head; there was evidence that her shirt was wet but not that her head was.  Thus, defendant's proposed inference is implausible anyway.

¶ 38    Second, that Dafne might have had a motive to falsify did not raise a reasonable doubt of defendant's guilt, but merely provided a classic credibility issue for the trial court to resolve. Defendant argues that his threat to contact ICE motivated Dafne to call 911 so that she could give the police a false account of the argument. Defendant also argues that the strained relationship between Dafne and him gave her a reason to fabricate her account.  But the possibility of fabrication merely raised a credibility issue.  Further, defendant testified inconsistently on whether he told Ramos that he was going to call ICE.  More important, there was no evidence that, at any time before Dafne called the police, defendant told her that he would call the immigration authorities.  Finally, the preexisting tension between defendant and Dafne did not require the trial court to discredit her account of the incident.  Indeed, the court could have inferred that defendant's long-standing anger at Dafne made it more likely that he would lash out at her physically.

¶ 39    Moreover, as the trial court explained at some length, Dafne also had strong reason not to falsely accuse defendant of a crime.  By calling the police, she risked alienating not only defendant

(who could evict her at any time) but her beloved sister, and she was further risking unpleasant inquiries into her legal status in the United States.

¶ 40    In sum, the evidence proved defendant guilty beyond a reasonable doubt.  Thus, his conviction must stand.

¶ 41                                    III. CONCLUSION

¶ 42    For the reasons stated, we affirm the judgment of the circuit court of Kane County.

¶ 43    Affirmed.